1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-Filed 7/2/2009**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

TAMIKO CARRILLO,

                   Plaintiff,

      v.

NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY, NATIONWIDE MUTUAL
INSURANCE, ALLIED INSURANCE,

                 Defendants.

Case Number C07-1979 JF

ORDER[1] (1) GRANTING
PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
AND (2) DENYING DEFENDANT'S
CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT

re: doc. nos. 76 & 81

Plaintiff Tamiko Carrillo ("Carrillo") brought the underlying action in this insurance

coverage case (the "Underlying Action") against Kristen Mansheim ("Mansheim"), Catherine

Casey ("Casey"), and two business entities owned and operated by Mansheim and Casey.  After

judgment in the Underlying Action was entered in favor of Carrillo, the instant action was filed

against Defendant Nationwide Mutual Fire Insurance Company ("Nationwide"), the issuer of

Casey's condominium insurance policy, to satisfy the judgment.  Carrillo's First Amended

Complaint ("FAC") sets forth three claims for relief:  (1) breach of contract; (2) violation of Cal.

Ins. Code § 11580; and (3) breach of the implied covenant of good faith and fair dealing.

---

[1]  This disposition is not designated for publication in the official reports.

1   Carrillo seeks partial summary judgment with respect to Nationwide's alleged breach of

2   its duty to defend Casey in the Underlying Action.  Nationwide has filed a cross-motion with

3   respect to the same issue and with respect to Carrillo's allegation that its refusal to provide a

4   defense was in bad faith.  For the reasons set forth below, Carrillo's motion will be granted and

5   Nationwide's cross-motion will be denied.

6                                    **I. BACKGROUND**

7       The relevant facts largely are undisputed.  Casey and Mansheim, through their business

8   entities, provided professional services to individuals and institutional clients.  While the precise

9   nature of their services is disputed, Casey has described herself as a "life coach."  Prior to the

10  events giving rise to her claims, Carrillo was involved in an intimate relationship with

11  Mansheim.  Casey asserts that she knew Carrillo only as Mansheim's partner and that she never

12  provided any treatment, training, or professional advice to Carrillo.

13      In September 2002, the relationship between Mansheim and Carrillo came to an abrupt

14  end.  On the day of the events at issue in the Underlying Action, Casey and Mansheim had an

15  appointment to provide professional services to a third-party client.  Prior to the appointment,

16  Casey received a telephone call from Mansheim, who was crying hysterically.  Mansheim

17  informed Casey that Carrillo had threatened to kill her and had taken their car.  Casey then drove

18  to Mansheim's residence.  After Casey arrived, she learned that Mansheim intended to terminate

19  her relationship with Carrillo.  Shortly thereafter, Carrillo arrived at the residence and forcibly

20  dragged Mansheim into a bedroom and locked the door.  Carrillo subsequently came out of the

21  bedroom, assaulted Casey, and then left the residence.  Casey then called the police.  When the

22  police arrived, Carrillo was brandishing a knife and threatening to kill herself.  Carrillo was

23  arrested and taken to a psychiatric facility for observation.

24      On June 3, 2003, Carrillo filed the Underlying Action in Santa Clara Superior Court

25  against Mansheim and Casey individually and against the business entities known as Mansheim

26  & Casey and Principle Psychology, the latter of which was the predecessor entity to Mansheim &

27  Casey.  In her complaint, Carrillo asserted thirteen claims for relief:  (1) medical malpractice I –

28  professional negligence; (2) medical malpractice II – abuse of transference; (3) intentional

2

1  infliction of emotional distress; (4) sexual contact by therapist (Cal. Civ. Code § 43.93); (5)

2  battery; (6) sexual battery (Cal. Civ. Code § 1708.5); (7) breach of fiduciary duty; (8) fraud; (9)

3  constructive fraud; (10) negligent misrepresentation; (11) sexual harassment (Cal. Civ. Code §

4  51.9); (12) general negligence; and (13) premises liability.  Paige Decl. Ex. A.  The factual

5  allegations centered on a purported breach of the professional therapist-patient relationship

6  between Carrillo and Mansheim and Casey.  Mansheim was named as a defendant in all thirteen

7  claims.  Casey and the business entities were named in seven of the claims (Medical Malpractice

8  I – Professional Negligence, Breach of Fiduciary Duty, Fraud, Constructive Fraud, Negligent

9  Misrepresentation, General Negligence and Premises Liability).  Carrillo alleged *inter alia* that

10 Mansheim "was a certified Alcohol and Drug Counselor, licensed by the State of California to

11 practice therapy, and in fact was providing counseling services in Santa Clara County" and to

12 Carrillo in particular.  Paige Decl. Ex. A.¶ 6.  Carrillo further alleged that Casey's occupation

13 was that of "Marriage Counselor and Family Therapist intern, licensed by the State of California

14 to practice therapy in California pursuant to its laws," and that Casey "provided counseling

15 services to [Carrillo]."  *Id.* ¶ 7.

16        On October 9, 2003, Casey tendered the Underlying Action and a copy of the complaint

17 to Nationwide.  Paige Decl. ¶ 4 & Ex. C.  Nationwide was the issuer of a condominium policy

18 held by Casey, pursuant to which Nationwide was obligated to defend and/or indemnify an

19 insured for covered occurrences.  *Id.* ¶ 3 & Ex. B at 28.  After Nationwide received the tender, it

20 assigned the matter to Leslie Paige ("Paige"), a non-attorney "litigation specialist."  *Id.* ¶ 5.

21 Paige determined that a statement from Casey was required, and she contacted Casey's counsel to

22 make the necessary arrangements.  *Id.* ¶ 5.  On November 21, 2003, a field adjuster for

23 Nationwide met with Casey and her counsel.  *Id.* ¶ 8. The field adjuster's notes with respect to

24 the meeting read in relevant part as follows:

25        MET W/ PH [Casey] & PH ATTNY...BEFORE WE BEGAN
          ATTNY DISCUSSED SUIT W/ ME OFF RECORD.  HE SAID
26        PLNT TAMIKO CURILLO [sic] NEVER HAD PROFESSIONAL
          RELATIONSHIP W/ PH CASEY.  PLNT WAS INVOLVED IN
27        PERSONAL RELATIONSHIP WITH PH PARTNER (CO DEF
          MANSHEIM) FOR YEARS.  PLNT & CO DEF WERE ALL
28        FRIENDS & HUNG OUT TOGETHER FOR SOCIAL OUTINGS,

1                      VACATIONS, EA OTHERS [sic] HOUSES FOR DINNER
                      ETC...PH DID NOT PROVIDE PROFESSIONAL THERAPY OF
2                       ANY KIND TO PLNT CURILLO [sic]...ATTNY SAID ACTIONS
                      ARE AGAINST MANSHEIM, NOT PH.  HE SAID A LOT OF
3                       THE CAUSE OF ACTION MADE NO SENSE TO HIM OR HIS
                      CLIENT BECAUSE IT WAS ONLY A SOCAIL [sic] FRIEND
4                       RELATIONSHIP.  HE BELIEVES SUIT STEMS FROM
                      INCIDENT 9/16/2002 WHERE THER [sic] WAS AN ATTACK
5                       & CRIMINAL CASE HAD BEEN FILED.

6    *Id.* Ex. F at 5-6. Casey also provided a recorded statement at the meeting.  In the statement, she

7    made the following representations:  (1) the purpose of her business with Mansheim was to

8    provide "educational seminars" about "health realization;" (2) health realization helps people

9    "cope with stress or job issues;" (3) health realization is not a form of therapy but rather "an

10    educational model;" (4) a license is not required to teach health realization; (5) neither she nor

11    Mansheim were licensed formally by Santa Clara County; (6) Casey's professional title was

12    "training consultant;" (7) Casey did not know Carrillo until after Carrillo became Mansheim's

13    companion; (8) Casey and Carrillo were no more than "social friends;" and (9) any

14    characterization of the services provided by Casey or Mansheim as being a form of therapy were

15    "[a]bsolutely false." *Id.* Ex. G at 1-3.  In her statement, Casey also provided details with respect

16    to the September 2002 altercation.  *Id.* at 4-5.

17        On January 2, 2004, Nationwide provided Casey with written notice of its determination

18    that the allegations in the Underlying Action were not covered under the insurance policy.

19    Shortly after the denial of coverage, Mansheim declared bankruptcy, temporarily staying the

20    Underlying Action.  Casey and Carrillo then negotiated an agreement, pursuant to which Carrillo

21    agreed to limit her right to execute on any judgment to the amount of available insurance

22    coverage and any other amounts collected from any insurer in exchange for Casey's assignment

23    and transfer to Carrillo of all rights against Nationwide (and other carriers) as a result of

24    Nationwide's refusal to provide a defense.  Murphy Decl. ¶ 4 & Exs. A-C.  That agreement was

25    finalized in December 2005.

26        Subsequently, Carrillo proceeded to trial against Casey and Mansheim.  The proceedings

27    were uncontested.  The superior court admitted certain evidence, including declarations and

28    unsworn testimony from Carrillo.  One of the declarations was from Peter Rutter, M.D., who

1    opined that Mansheim had violated various professional duties owed by a therapist to a patient

2    and that Casey should have intervened but had failed to do so.  *Id*. ¶ 7 & Ex. E.  Neither Casey

3    nor Mansheim appeared or testified, and the proceedings lasted less than half an hour.  Murphy

4    Decl. ¶ 6 & Ex. D.  Judgment was entered in favor of Carrillo and against Casey and the business

5    entities in the amount of $1,423,800, with interest.  *Id*. at Ex. G.  The judgment omitted

6    apportionment of fault or any findings of fault with respect to Mansheim.

7                                    **II.  LEGAL STANDARD**

8         Summary judgment should be granted only when there are no genuine issues of material

9    fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

10   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial

11   burden of informing the court of the basis for the motion and identifying the portions of the

12   pleadings, depositions, or other evidence that demonstrate the absence of a triable issue of

13   material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this

14   initial burden, the burden shifts to the non-moving party to present specific facts showing that

15   there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  Once the

16   moving party meets this burden, the nonmoving party may not rest upon mere allegations or

17   denials, and instead must present evidence sufficient to demonstrate that there is a genuine issue

18   for trial.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  A genuine issue for trial

19   exists if the non-moving party presents evidence from which a reasonable jury, viewing the

20   evidence in the light most favorable to that party, could resolve the material issue in his or her

21   favor.  *Anderson*, 477 U.S. 242, 248-49.  Under Fed. R. Civ. P. 56(d), "[i]f summary judgment is

22   not rendered on the whole action, the court should, to the extent practicable, determine what

23   material facts are not genuinely at issue…It should then issue an order specifying what

24   facts—including items of damages or other relief—are not genuinely at issue.  The facts so

25   specified must be treated as established in the action."

26        Because this Court's subject matter jurisdiction is based on diversity of citizenship

27   between the parties, the substantive law of the forum state governs the instant dispute.  *Erie R.R.*

28   *Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Under California law, "[w]here the terms and

                                           5

1   conditions of an insurance policy constitute the entire agreement between the parties, its

2   interpretation is essentially a question of law, particularly well-suited for summary judgment."

3   *State Farm Fire & Cas. Co. v. Yukiyo, Ltd.*, 870 F. Supp. 292, 294 (N.D. Cal. 1994) (citing *St.*

4   *Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 867 (9th Cir. 1979)).  The insured has the

5   initial burden of showing that an event should be covered.  *Whittaker Corp. v. Allianz*

6   *Underwriters, Inc.*, 11 Cal. App. 4th 1236, 1244 (1992).  Once an event has been shown to fall

7   within the scope of coverage, the insurer has the burden of showing that an exclusion or

8   limitation applies.  *Essex Ins. Co. v. City of Bakersfield*, 154 Cal. App. 4th 696, 705 (2007).

9                                                   **III.  DISCUSSION**

10          Nationwide contends that it did not owe a duty to defend in the Underlying Action

11  because the acts alleged against its insured were either intentional in nature or excluded as a

12  business activity.  Nationwide also seeks summary adjudication with respect to Carrillo's claim

13  for breach of the implied covenant of good faith and fair dealing on the ground that its

14  determination that there was no duty to defend was reasonable as a matter of law.  In response,

15  Carrillo asserts that Nationwide had a duty to defend Casey irrespective of any exclusions

16  contained in the policy.  Carrillo also argues that the teaching exception to the business activity

17  exclusion provided at least a possibility of coverage and that Nationwide's decision to deny a

18  defense was the product of bad faith.

19          A.  Breach of Duty to Defend

20          The duty to defend is broader than the duty to indemnify.  *Storek v. Fidelity & Guar. Ins.*

21  *Underwriters, Inc.*, 504 F. Supp. 2d 803, 810 (N.D. Cal. 2007); *Montrose Chem. Corp. v.*

22  *Admiral Ins. Co.*, 10 Cal. 4th 645, 660 n.9 (1995) ("The obligation to indemnify must be

23  distinguished from the duty to defend.  The duty to defend arises when there is a potential for

24  indemnity.  It may exist even when coverage is in doubt and ultimately is not established.")

25  (citations omitted).  Whether a duty to defend exists is a question of law.  *Peters v. Firemen's*

26  *Ins. Co.*, 67 Cal. App. 4th 808, 811 (1998).  "[O]n a motion for summary judgment regarding its

27  duty to defend, the insurer must be able to negate any potential coverage as a matter of law."  *N.*

28  *Am. Bldg. Maint., Inc. v. Fireman's Fund Ins. Co.*, 137 Cal. App. 4th 627, 640 (2006).  If there is

                                                             6

1   any doubt "as to whether the facts establish the existence of the defense duty," the dispute must

2   be resolved in favor of the insured. *Montrose Chem. Corp. v. Sup. Ct.*, 6 Cal. 4th 287, 299-300

3   (1993).

4                              1. Applicable Policy Language

5          The January 2004 notice of denial stated in relevant part as follows:

6                  [Nationwide's] investigation revealed that Kristen Mansheim is a
                   certified Alcohol and Drug Counselor providing counseling
7                  services to plaintiff [Carrillo] in Santa Clara County.
                   CatherineMary [sic] Casey was a Marriage and Family Therapist
8                  intern, License #27782 issued August 23, 1995 (expired August 31,
                   2000) in Santa Clara, California.  Mansheim and Casey are friends
9                  and business partners in a company called Principle Psychology.

10  Paige Decl. Ex. H at 1.  The notice characterized the gravamen of the Underlying Action as a

11  complaint that Carrillo's "mental condition worsened" as a result of "defendant's negligence in

12  treating, diagnosing, and supervising" Carrillo.  *Id*.  The notice then quoted the applicable

13  provisions of the insurance policy:

14          SECTION II - LIABILITY COVERAGES
                We will pay damages the insured is legally obligated to pay due to an
15              occurrence.

16          DEFINITIONS
                3. "Bodily Injury" means bodily harm, sickness or disease, including resulting
17              care, loss of services and death.

18              4. "Business" includes trade, profession, or occupation.

19              9. "Property damage" means physical injury to or destruction of tangible
                property.  This includes resulting loss of its use.
20
                11. "Occurrence" means bodily injury or property damage resulting from:
21                  a. one accident; or
                    b. continuous or repeated exposure to the same general condition.
22
    *Id*. at 2.  Citing this policy language, Nationwide stated:  "Since the subject matter does not
23
    constitute a suit seeking damage on account or bodily injury, or property damage caused by an
24
    occurrence as defined in the policy, no duty to defend or indemnify is triggered under the policy.
25
    In addition, the below quoted Exclusions would specifically exclude coverage."[2]  *Id*.  The
26

27  ───────────────────
          [2] Nationwide now argues that an amended definition of "occurrence" applies, despite the
28  fact that the notice provided to Casey as well as Nationwide's response to the Requests for
    Admissions promulgated by Casey demonstrate that Nationwide was considering the original

                                                    7

relevant exclusions were:

> SECTION II - EXCLUSIONS
> 1. Coverage D- Personal Liability, and Coverage E- Medical payments to others do not apply to bodily injury or property damage:
>
>> b. arising out of business pursuits of an insured....
>>
>>> This exclusion does not apply to:
>>> (1) activities normal [sic] considered non-business
>>
>> c. arising out of any professional liability except teaching.
>
> 2. Coverage D- Personal liability does not apply to:
>
>> a. liability assumed under any unwritten contract or agreement, or by contract or agreement in connection with any business of the insured.

*Id*. at 2-3.  The notice then stated:  "Since the suit allegations arise from your client's business pursuits, coverage would be specifically excluded by the above quoted Exclusion."  *Id*. at 3.  It further reserved the right to amend or supplement the denial of coverage upon the receipt of any additional information.  *Id*.  The notice also stated that the denial was based on the information provided by the claimant, and that Casey had the right to appeal the denial or provide additional information relevant to the coverage determination.  *See id*.  Nationwide received no further response from Casey.  *Id*. ¶ 19.

Whether an insurer has a duty to defend is determined primarily by the allegations in the underlying complaint.  *Moore v. Fidelity & Cas. Co. of N.Y.*, 140 Cal. App. 2d Supp. 967, 970 (1956).  Carrillo contends that any dispute about whether the allegations of the complaint fall under the definition of an "occurrence" is irrelevant because the language of the policy provides for an unconditional duty to defend.  Under the "Coverage D" subsection for "Personal Liability," the policy recites as follows:  "We will pay damages the insured is legally obligated to pay due to an occurrence.  We will provide a defense at our expense by counsel of our choice.  We may investigate and settle any claim or suit.  Our duty to defend a claim or suit ends when the amount we pay for damages equals our limit of liability."  Paige Decl. Ex. B at 28.  Carrillo argues the policy thus does not condition the duty to defend ("We will provide a defense…") on

---

definition when it analyzed Casey's claim.  *See* Mannion Decl. Ex. 2.  As discussed in further detail below, a duty to defend arose under either of the two definitions.

8

1  a determination that the allegations against the insured are a covered occurrence.  In contrast, the

2  duty to indemnify ("We will pay damages the insured is legally obligated to pay…") is

3  conditioned on an express determination that there has been an "occurrence."

4        "[A] court that is faced with an argument for coverage based on assertedly ambiguous

5  policy language must first attempt to determine whether coverage is consistent with the insured's

6  objectively reasonable expectations.  In so doing, the court must interpret the language in

7  context, with regard to its intended function in the policy." *Bank of the West v. Sup. Ct.*, 2 Cal.

8  4th 1254, 1265 (1992).  If there is ambiguity, any disputed terms should be construed against the

9  insurer.  *Id.* at 1264.  Normally, a duty to defend is conditioned on potential coverage under the

10  policy.  *See* 14 Couch on Ins. § 201:6 ("Generally, there is no duty to defend where there is no

11  'occurrence' within the policy definition of that term.").  However, the policy in the instant case

12  contains no such limitation.  At best, the language of the policy is ambiguous with respect to

13  whether a duty to defend is conditioned on an occurrence, and such ambiguity must be resolved

14  in favor of the insured.  *Montrose v. Sup. Ct.*, 6 Cal. 4th at 299-300.  *See also Gray v. Zurich Ins.

15  Co.*, 65 Cal. 2d 263, 275 (1966) (where "provisions as to the obligation to defend are uncertain

16  and undefined; in the light of the reasonable expectation of the insured, they require the

17  performance of that duty.").  In addition, because the Court finds that the duty to defend is not

18  dependent on whether the allegations against Casey constituted an occurrence, the duty to defend

19  exists even for claims alleging conduct that clearly would not constitute an "occurrence," *i.e.*,

20  intentional acts and business activity.  *See Gray*, 65 Cal. 2d at 275 (where a "broadly stated

21  promise to defend is not conspicuously or clearly conditioned solely on a nonintentional bodily

22  injury…the insured could  reasonably expect such protection.").  Accordingly, the Court

23  concludes that as a matter of law Nationwide breached its duty to defend Casey in the Underlying

24  Action.

25                    2.  Allegations in Underlying Action

26        Even if Nationwide's duty to defend were conditioned on the existence of an occurrence

27  and any applicable exclusions, such circumstances would not affect the Court's ultimate

28  conclusion.  An insurance company "must defend a suit which potentially seeks damages within

9

1   the coverage of the policy." *Gray*, 65 Cal. 2d at 275.  Even if the underlying complaint does not

2   allege unequivocally the insured's liability for potentially covered damages, the duty to defend is

3   triggered if the complaint could be amended to allege such liability or if the insurer is aware of

4   facts from another source that suggest the existence of such liability. *Montrose v. Sup. Ct.*, 6 Cal.

5   4th at 299-300.  As such, the mere "potential" or "possibility" of coverage is sufficient to trigger

6   the duty to defend, and any doubt as to the existence of a defense duty must be resolved in the

7   insured's favor. *Id.*; *Storek*, 504 F. Supp. 2d at 810 ("under California law, an insurer must

8   defend against groundless, false, or even fraudulent claims, regardless of their merits.").

9        In the instant case, the relevant allegations in the complaint filed by Carrillo in the

10   Underlying Action included:

11
12         8.  At all times herein mentioned, defendants MANSHEIM,
        CASEY, and DOES 1-10 were friends and business partners in a
        company called Principle Psychology, and then called
13         MANSHEIM and CASEY, and offered classes in Health
        Realization…

14         16.G. [Medical Malpractice] ALL DEFENDANTS - Instead of
        treating Plaintiff [Carrillo] with a traditional cognitive model,
15         Defendants practiced "Health Realization" and convinced
        [P]laintiff that their way was the right way…
16
17         16.FF.  CASEY - Wrongfully telling the police that [P]laintiff had
        multiple personality disorder…

18         16.GG.  CASEY - Knowing of the inappropriate affair between
        MANSHEIM and [P]laintiff and not reporting MANSHEIM to any
19         therapy or licensing board…

20   Paige Decl. Ex. B.  Nationwide argues that the Carrillo's complaint only contained allegations

21   that could be linked to the alleged patient-therapist relationship and thus there was no potential

22   coverage under the policy because of the business pursuits exclusion.  However, because the

23   complaint alleged that Casey's business as included "classes," the teaching exception to the

24   exclusion raised the possibility of coverage. *See Century Sur. Co. v. Polisso*, 139 Cal. App. 4th

25   922, 951 (2006) ("the insurer has the burden of showing the claim falls within an exclusion, and

26   exclusions are narrowly construed.").  In addition, Casey's alleged misrepresentation to police, as

27   well as her alleged failure to report Mansheim's conduct to the appropriate licensing board, may

28   have formed the basis for an actionable claim of negligence, even though the operative complaint

1    did not allege all of the required elements of such a claim.  *See Pension Trust Fund for*

2    *Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002) ("California courts have

3    repeatedly found that remote facts buried within causes of action that may potentially give rise to

4    coverage are sufficient to invoke the defense duty.").  While Nationwide points out that there is

5    no cognizable claim under California law arising from being a "bad friend," providing

6    misinformation to the police that results in a person's wrongful arrest or detention may constitute

7    negligence.  *See Pool v. City of Oakland*, 42 Cal. 3d 1051, 1064 (1986).  While Carrillo may

8    have had little chance of success under such a theory, such a consideration is irrelevant in the

9    present context as it "ignores the insurer's promise to defend the insured against groundless,

10   false, and fraudulent claims.  An insured buys liability insurance in large part to secure a defense

11   against all claims potentially within policy coverage, even frivolous claims unjustly brought."

12   *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1086 (1993).

13       Carrillo also alleged a claim for premises liability against both Casey and Mansheim.

14   That claim for relief incorporated by reference all prior allegations and specifically alleged, *inter*

15   *alia*, that "[P]laintiff was an invited guest into defendant's home," that Mansheim and/or Casey

16   "had a duty to exercise ordinary care and use, maintain and/or manage the premises in order to

17   avoid exposing persons on the property to an unreasonable risk of harm, including harm caused

18   by the criminal or negligent or intentional misconduct of third persons on the premises," and that

19   "[a] special relationship existed between [P]laintiff and defendant in that defendant invited

20   [P]laintiff into her home.  This relationship imposed a duty upon each defendant to all things

21   reasonably necessary to protect [P]laintiff from harm on the subject premises…"  Paige Decl. Ex.

22   B ¶¶ 86-88.  Carrillo alleged further that "defendants acted negligently with regard to the

23   maintenance and control of the premises so as to cause injury to the [P]laintiff.  Defendant

24   negligently and carelessly allowed the other defendant to commit the wrongful misconduct

25   otherwise alleged in this Complaint…"  *Id.* ¶ 89.  While the allegations as framed did not

26   distinguish whose residence was at issue, and thus it is unclear whether Carrillo in fact was

27   accusing Casey of failing to control misconduct by Mansheim at Casey's residence, a claim for

28   relief could be maintained under such circumstances.  *See Am. States Ins. Co. v. Borbor by*

11

1    *Borbor*, 826 F.2d 888, 895 (9th Cir. 1987) (coverage available for negligent supervision of

2    business partner's intentional misconduct).  As discussed above, any ambiguity must be resolved

3    against the insurer.  *See Montrose v. Sup. Ct.*, 6 Cal. 4th at 299-300.

4                        3.  Extrinsic Evidence

5           Evidence outside of the complaint also may be considered in determining the existence of

6    a duty to defend.  *Storek*, 504 F. Supp. 2d at 809.  "Facts extrinsic to the complaint give rise to a

7    duty to defend when they reveal a possibility that the claim may be covered by the policy."

8    *Waller*, 11 Cal. 4th at 19.  However, if extrinsic facts eliminate the potential for coverage, the

9    insurer may decline to defend even when the bare allegations in the complaint suggest potential

10   liability.  *Id*.  "This is because the duty to defend, although broad, is not unlimited; it is measured

11   by the nature and kinds of risks covered by the policy."  *Id*.

12          The information provided by Casey after the claim was tendered further supports the

13   conclusion that Nationwide had a duty to defend in light of the teaching exception to the business

14   pursuits exclusion.  In a recorded interview that took place on November 21, 2003—prior to

15   Nationwide's notice of denial—Casey described her business with Mansheim as one that

16   "provided ongoing, you know, seminars, coaching, things like that."  Paige Decl. Ex. G at 1.

17   When a Nationwide representative asked Casey what was meant by "coaching," the response was

18   that "basically we would teach people uh a concept about where there [sic] physiological

19   experience comes from in general…[to] help people, you know, cope with stress or job issues."

20   *Id*. at 2.  Then the Nationwide representative asked, as "a point of clarification," whether Casey's

21   business provided "therapeutic services."  *Id*.  Casey then replied, "No, it's not therapy.  It's an

22   educational model…I do not provide therapeutic services."  *Id*.  Casey further informed

23   Nationwide that no license was required to provide such services and that Mansheim likewise

24   was engaged in teaching rather than therapy.  *Id*.  This additional information was sufficient at

25   least to raise a question as to whether the policy's teaching exception applied.  Casey also

26   informed Nationwide that Mansheim and Carrillo would visit Casey's residence, *id*. at 3, lending

27   further credence to a covered occurrence under Carrillo's claim for premises liability.

28

                                        12

1

B.  Breach of the Implied Covenant of Good Faith and Fair Dealing

2      "To establish a bad faith claim, the insured must show that (1) benefits due under the

3  policy were withheld and (2) the reason for withholding the benefits was unreasonable or without

4  proper cause."  *Polisso*, 139 Cal. App. 4th at 949.  As set forth above, Carrillo has satisfied the

5  first prong of this test.  Accordingly, the Court must determine if Nationwide's denial of a

6  defense was unreasonable.  A denial of benefits is unreasonable if the withholding is without

7  "good cause."  *See Safeco Ins. Co. of Am. v. Guyton*, 692 F.2d 551, 557 n.7 (1982); *Gruenberg v.*

8  *Aetna Ins. Co.*, 9 Cal. 3d 566, 574 (1973) ("Where…[an insurer] fails to deal fairly and in good

9  faith with its insured by refusing, without proper cause, to compensate its insured for a loss

10  covered by the policy, such conduct may give rise to a cause of action in tort for breach of an

11  implied covenant of good faith and fair dealing.").  A mere mistake, for example a denial based

12  upon misinformation, will not support a claim for bad faith.  *Cal. Shoppers, Inc. v. Royal Globe*

13  *Ins*. *Co.*, 175 Cal. App. 3d 1, 55 (1985) ("bad faith implies unfair dealing rather than mistaken

14  judgment.") (citation omitted).  *See also Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1166 (9th Cir.

15  1995) ("In California, mere negligence is not enough to constitute unreasonable behavior for the

16  purpose of establishing a breach of the implied covenant of good faith and fair dealing in an

17  insurance case."); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1281 (1994)

18  ("[the] erroneous denial of a claim does not alone support tort liability; instead, tort liability

19  requires that the insurer be found to have withheld benefits unreasonably.").  Reasonableness is

20  evaluated under the circumstances present at the time of the denial, and hindsight may not be

21  considered as part of the analysis.[3]  *Polisso*, 139 Cal. App. 4th at 949.

22

_____

23      [3] An alternate standard for bad faith claims is whether a "genuine dispute" existed with
respect to coverage, with the existence of a genuine dispute acting as a defense. *See Polisso*, 139
24  Cal. App. 4th at 949 ("[The genuine dispute] doctrine holds that an insurer does not act in bad
faith when it mistakenly withholds policy benefits, if the mistake is reasonable or is based on a
25  legitimate dispute as to the insurer's liability.  However, the genuine dispute defense usually
applies only in cases involving first-party coverage rather than in a defense against a third-party
26  claim.  *See id.* at 951.  At least one court has pointed out that the doctrine is not applicable in the
duty to defend context because the existence of a genuine dispute as to coverage necessarily
27  means that there was a duty to defend.  *Harbison v. Am. Motorists Ins. Co.*, No. CS-04-2542,
2009 WL 1808615, at *8 (E.D. Cal. June 24, 2009) ("Because the existence of a genuine dispute
28

13

1   "[R]easonableness of an insurer's claim-handling conduct is ordinarily a question of

2   fact." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1009-10 (9th Cir.2004)

3   (*quoting Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002)).

4   However, the reasonableness determination may be adjudicated as a question of law when "the

5   evidence is undisputed and only one reasonable inference can be drawn from the evidence."

6   *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal. App. 4th 335,

7   346 (2001).  Whether a denial was reasonable is determined from the circumstances evident at

8   the time of refusal, rather than on later developments or with the benefit of hindsight.  *Polisso*,

9   139 Cal. App. 4th at 949.

10       Nationwide argues that its decision to deny Casey a defense was reasonable because the

11  allegations in the Underlying Action were excluded under the policy, and its conclusion tot hat

12  effect was realized only after careful follow-up investigation.  In response, Carrillo contends that

13  Nationwide purposefully sought to deny the claim, despite the existence of a clear duty to defend

14  when the Underlying Action was tendered.  Carrillo highlights the following deposition

15  testimony of litigation specialist Paige:

16          Q:  Now–and what definition of "accident" were you using in
        2003-2004 in determining whether there was an occurrence?

17

18          A:  [Paige] I read it the way it was.

        Q:  What did "accident" mean to you in 2003 and 2004?

19

20          A:  Probably something specifically that occurred. Falling down
        the stairs would be an accident.

21          Q:  Well, that's an example of an accident.  Did you have an
        operational definition that you used in analyzing whether the

22          claims asserted in a claim constituted an "accident"?

23          A:  No.

24          Q:  Were you provided by anybody in any of your training at any of
        the companies with a definition for "accident"?

25

26  ─────────────────────

27  as to the insurer's liability indicates that there is at least a potential for coverage, the existence of
    a genuine dispute is itself enough to trigger the insurer's duty to defend…the genuine dispute

28  doctrine appears wholly incompatible with duty to defend cases.").

14

1    A: No.

2    Q:  Did you create in your own mind a definition of the term
     "accident"?

3

4    A: No.

5    Q:  Did you see any analysis by anyone as to what constitutes an
     "accident" prior to denying this claim?

6    A: I don't understand the question.

7    Q:  Had you seen any letters from any lawyers doing an analysis of
     what constitutes an accident prior to denying this claim?

8

9    A: No.

10   Q:  Had you seen any articles from any source describing what
     constitutes an accident–

11   A: No.

12   Q:  –prior to your denying this claim?

13   A: No.

14   Q:  Had you had any discussion with anybody in management at
     Allied [the defendant] as to what constitutes an accident prior to
15   denying the claim?

16   A: No.

17   Mannion Decl. Ex. 4 at 42-44.  Viewing the above testimony in the light most favorable to the

18   non-moving party, it appears at best that Nationwide provided inadequate training to its

19   employees, and at worst that Paige—who had worked in claims handling for approximately thirty

20   years—was being evasive, as it is not plausible that a non-attorney would not have received some

21   instruction on the meaning of "accident" in the duty to defend context.  Admittedly, Casey did

22   not appeal the denial, and it's entirely possible that Nationwide's decision was the result of an

23   honest and reasonable belief about the scope of coverage.  However, taken as a whole, Paige's

24   testimony reveals that she (1) ignored (or at least misread) allegations that possibly were covered

25   and (2) saw no real justification for doing so.  *See*, *e.g.*, *id*. at 60 ("the allegations *mostly* have to

26   do with [Casey] knowingly not protecting [Carrillo] from something") (emphasis added); 62 ("as

27   far as an occurrence at [Casey's] residence, I didn't see that" and the allegations of negligence

28   did not "matter[]"); 63 ("[Casey] voluntarily had them at the house, but there was no occurrence.

15

What happened there?  Where is the harm?"); 64 ("all of the allegations *besides this one* had to

do with the business and occupation of [Casey]") (emphasis added); 68 ("The allegation it looks

like is saying that [Casey] did not protect [Carrillo] from harm.  It doesn't say what the harm

was.  I don't know where the occurrence is.  I'm not clear what the bodily injury was as far as

them exercising due care…even if there was bodily injury and property damage, *which it seems*

*in bits and pieces there was*, there was no occurrence in the policy") (emphasis added).

    Nor does the testimony of Paige's supervisor support Nationwide's position:

> Q:  Looking at the allegations in the complaint where the plaintiff
> has alleged that this conduct was negligent, you have to accept that
> at face value in determining whether or not to provide a tender of
> defense, correct?
>
> A:  [supervisor] I'm not sure.
>
> Q:  Can you substitute your own understanding of what occurred
> for the allegations of the complaint if your understanding of what
> occurred is inconsistent with the allegations of the complaint?
>
> A:  I don't know.
>
> Q:  If there are allegations in a complaint that certain things
> occurred negligently so that they would possibly fit within the
> definition of an accident, can you, based on your own perception of
> what occurred, without any factual support, decide it was done
> intentionally?
>
> A: I don't know.

Mannion Decl. Ex. 5 at 42.  "The determination of bad faith…depends on an identification of

inferences permissibly drawn from the facts."  *Tomaselli*, 25 Cal. App. 4th at 1281.  Under the

circumstances, a reasonable jury could conclude that Nationwide lacked good cause to deny

Casey's claim.

16

1

**IV.  ORDER**

2        Good cause therefor appearing, IT IS HEREBY ORDERED that Carrillo's motion for

3  partial summary judgment with respect to her claim for breach of the duty to defend is

4  GRANTED.  Nationwide's cross-motions for partial summary judgment with respect to

5  Carrillo's claims for breach of the duty to defend and breach of the implied covenant of good

6  faith and fair dealing are DENIED.

7

8  DATED: July 2, 2009

9

10                                                    _____

11                                                    JEREMY FOGEL
                                                      United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 07-1979
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ETC.
(JFLC1)

This Order has been served upon the following persons:

Anna Atanassova Chopova     achopova@rwblaw.com, lspalding@rwblaw.com

Demian Isaac Oksenendler     doksenendler@sbcglobal.net, richhubbard@sbcglobal.net

Edward Gerard Mannion     gmannion@sbcglobal.net, richhubbard@sbcglobal.net

Edward P. Murphy     emurphy@rwblaw.com, cromo@rwblaw.com

George Edward Rudloff, Jr.     erudloff@rwblaw.com, bparker@rwblaw.com

Wesley Martin Lowe     wlowe@sbcglobal.net, lvillegas1@sbcglobal.net

Case No. C 07-1979
ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ETC.
(JFLC1)